(October 5, 1923.)

BOISE CITY, Appellant, v. IDAHO POWER COMPANY and PUBLIC UTILITIES COMMISSION OF THE STATE OF IDAHO, Respondents.

[220 Pac. 483.]

PUBLIC UTILITIES — MUNICIPAL CORPORATION — CONTRACTS BETWEEN — POWER OF COMMISSION—DUPLICATE EQUIPMENT—MAINTENANCE OF.

1. The right of a municipal corporation, reserved in a franchise granted a public utility, to purchase the system erected under authority of the franchise, has no reasonable relation to fixing or determining rates to be charged by such public utility.

2. When a public utility, as the result of the purchase by it of a competing utility, found that it had duplicate equipment by reason of the consolidation of the two systems, and, in order to be able to remove or dispose of such duplicate equipment, entered into a contract with the municipality in which the municipality, for a stated consideration, surrendered all its rights reserved in a franchise under which one of the systems was constructed, among which was a right to purchase the system constructed under such franchise, thereby enabling the utility to remove such duplicate equipment, the utility is the beneficiary of the contract; and an order of the utilities commission directing that the consideration to be paid, under the contract, to the municipality, be collected by the utility from its users in the municipality, is beyond the power of the commission and is void.

APPEAL from orders of the Public Utilities Commission. *Orders set aside.*

J. M. Lampert, E. P. Barnes, Henry Z. Johnson and C. S. Hunter, City Attorney, for Appellant.

A franchise granted by a municipality to a public utility, pursuant to authority conferred by law, after it has been accepted by the public utility, is binding on the municipality and the state as well, and constitutes a contract protected by the United States constitution against the state legislature impairing it, the consideration therefor being the public utility undertaking to perform a public service for a fixed period. (*Central Union Telephone Co. v. Indianapolis Telephone Co.,* 189 Ind. 210, 126 N. E. 628; *Greensburg Water Co. v. Lewis,* 188 Ind. 439, 128 N. E. 103.)

Where contract terms between a state or municipality and a corporation or individual are the proper subject matters of a contract between such parties, and plainly express the duties of the parties, and the contract is legally entered into, it is within the protection of the contract clause (Const. U. S., art. 1, sec. 10), and cannot be impaired by the state or municipality. (*Chicago, R. I. & P. Ry. Co. v. Taylor,* 79 Okl. 142, 192 Pac. 349.)

Franchise contracts are under the protection of the provisions of the federal constitution relating to the impairment of contracts and due process of law. (*Columbus R. Power & Light Co. v. Columbus,* 249 U. S. 399, 39 Sup. Ct. 349, 63 L. ed. 669; *Knoxville Gas Co. v. Knoxville,* 253 Fed. 217; *Cleveland v. Cleveland City R. Co.,* 194 U. S. 517, 24 Sup. Ct. 756, 48 L. ed. 1102; *Detroit v. Detroit Citizens' Street R. Co.,* 184 U. S. 368, 22 Sup. Ct. 410, 46 L. ed. 592; *Knoxville Water Co. v. Knoxville,* 189 U. S. 437, 23 Sup. Ct. 531, 47 L. ed. 891; *City R. Co. v. Citizens' Street R. Co.,* 166 U. S. 557, 17 Sup. Ct. 653, 41 L. ed. 1114.)

The power company, successor in interest of the Beaver River Company, cannot be released or relieved from any liability under such franchise. (Const., art. 11, sec. 15; *Cooper v. Utah L. & Ry. Co.,* 35 Utah, 170, 102 Pac. 202.)

The orders appealed from are null and void, for the reason that the utilities commission had not been empowered by the act creating it to abrogate or nullify conditions attached to or contained in franchise agreements between municipalities and public service corporations already entered into at the time of the adoption of the act. (*Quinby v. Public Service Com.,* 223 N. Y. 244, 119 N. E. 433, 3 A. L. R. 685; *City of Niagara Falls v. Public Service Com.,* 229 N. Y. 333, 128 N. E. 247; *City of Lima v. Public Utilities Com.,* 100 Ohio 416, 126 N. E. 318.) The commission has such jurisdiction and authority only as is expressly or by necessary implication conferred upon it by the legislature and no other.

The shifting of the payments in lieu of the franchise tax (which was to be canceled by the city), as a consideration for the duplicate equipment, on to the consumers in Boise City, of which Boise City was one, to be prorated among them, thereby creating and imposing a surcharge upon them, is a subterfuge, as dishonest as it is unprecedented. (*Oklahoma City v. Corporation Com.,* 80 Okl. 194, 195 Pac. 498, and cases cited.)

Clarence T. Ward and Hawley & Hawley, for Respondent Idaho Power Co.

The commission approved the contracts, but noting that Boise City required the power company to pay an annual tax or payment, instructed the power company to collect that payment from the city patrons rather than from the general system patrons. This was a regular exercise of right and duty of the commission to prevent discrimination, unfair and unreasonable rates, treatment and practices. (C. S., secs. 2425, 2427, 2450–2452; *Idaho L. & P. Co. v. Blomquist,* 26 Ida. 222, Ann. Cas. 1916E, 282, 141 Pac. 1083; *Murray v. Public Utilities Com.,* 27 Ida. 603, 150 Pac. 47; *San Diego Land & Town Co. v. National City,* 174 U. S. 739, 19 Sup. Ct. 804, 43 L. ed. 1154; *Consolidated Gas Co. v. Newton,* 267 Fed. 231; *Contra Costa Water Co. v. City*

*of Oakland,* 165 Fed. 518; *Havre de Grace & P. B. Co. v. Towers,* 132 Md. 16, 103 Atl. 319; *Sandpoint L. & P. Co. v. City of Sandpoint,* 31 Ida. 498, 173 Pac. 192, L. R. A. 1918F, 1106; *Union Dry Goods Co. v. Georgia Public Service Corp.,* 248 U. S. 372, 39 Sup. Ct. 117, 63 L. ed. 309; *Minneapolis, St. P. & St. S. M. Ry. v. Menasha Woodenware Co.,* 159 Wis. 130, 150 N. W. 411, L. R. A. 1915F, 732; *Atlanta & W. P. R. Co. v. Camp,* 130 Ga. 1, 14 Ann. Cas. 439, 60 S. E. 177; *Durant v. Consumers' Light & P. Co.* (Okl.), 177 Pac. 361; *Leiper v. Baltimore & Pac. R. R. Co.,* 262 Pa. 328, 105 Atl. 551; *Schrader v. Steubenville,* 84 W. Va. 1, 99 S. E. 207; *Calhoun v. Capital Trust Co.,* 249 U. S. 596, 39 Sup. Ct. 289, 64 L. ed. 794; *Fulteron v. Board of Public Utility Com.,* 254 U. S. 394, 41 Sup. Ct. 169, 65 L. ed. 322; *Public Utilities Com. of Kansas v. Wichita,* 238 Fed. 37; *Raymond Lumber Co. v. Raymond L. & P. Co.,* 92 Wash. 330, 159 Pac. 132, L. R. A. 1917C, 574; *Atlantic Coast etc. Co. v. City of Goldsboro,* 232 U. S. 547, 34 Sup. Ct. 364, 58 L. ed. 721; *State v. Public Service Com.,* 275 Mo. 201, 204 S. W. 497; *Pawhuska Co. v. Pawhuska etc. Co.,* 64 Okl. 214, 166 Pac. 1058; *State ex rel. Webster v. Superior Court,* 67 Wash. 37, Ann. Cas. 1913D, 78, 120 Pac. 861, L. R. A. 1915C, 287; *Salt Lake City v. Utah P. & L. Co.,* 52 Utah, 210, 173 Pac. 556, 3 A. L. R. 726, and annotations; *Kansas City Bolt & Nut Co. v. Light Co.,* 275 Mo. 529, 204 S. W. 1074, affirmed by U. S. Sup. Ct., 252 U. S. 571, 40 Sup. Ct. 392, 64 L. ed. 721; *Randall Gas Co. v. Star Glass Co.,* 78 W. Va. 252, 88 S. E. 841; *Atlanta etc. Co. v. Camp,* 130 Ga. 1, 124 Am. St. 151; 14 Ann. Cas. 439, 60 S. E. 177, 9 A. L. R. 420, annotations, beginning p. 423; *Home Tel. & Tel. Co. v. Los Angeles,* 211 U. S. 265, 29 Sup. Ct. 50, 53 L. ed. 176; *Yuma Gas, L. & W. Co. v. City of Yuma,* 20 Ariz. 153, 178 Pac. 26.)

The commission, as the agent of the legislature, is charged with the duty of examining and changing, not only the rates in utility service contracts, but also the conditions of services and facilities where under any contract they may be

37 Idaho.—51

the source of preference or discrimination. (*Manigault v. Springs,* 199 U. S. 473, 26 Sup. Ct. 127, 50 L. ed. 274.)

The same power exists over contracts or franchises between utilities and municipalities. (*American Brake Shoe etc. Co. v. Pittsburg Ry. Co.,* 270 Fed. 812.)

It makes no difference that the contract antedated the creation of the commission. The rule is equally effective. (*McCook etc. Co. v. Burtless,* 98 Neb. 141, 152 N. W. 334, L. R. A. 1915D, 1205; *Sandpoint Water & Light Co. v. Sandpoint, supra.*)

A. H. Conner, Attorney General, for Respondent Public Utilities Commission.

WM. E. LEE, J.—In 1912, which was prior to the enactment of the law creating the Public Utilities Commission, the Beaver River Power Company was granted a franchise by the city of Boise to construct an electrical distribution system in the city for the purpose of supplying electrical energy to the city and its citizens, and, under the franchise, the Beaver River Power Company constructed its system at considerable expense. In consideration of the granting of this franchise by the city of Boise, the Beaver River Power Company agreed to pay the city of Boise, each year during the period of the franchise, a percentage of the gross receipts of the company from its business in Boise, and the city of Boise was given the right, at the expiration of the term of the franchise, to purchase the property installed thereunder. The term of the franchise was twenty years. The Idaho Power Company, one of the respondents herein, subsequently acquired the property of the Beaver River Power Company, including the franchise. Boise City also granted a franchise to another of the predecessors of the Idaho Power Company to construct a system for the distribution and sale of electrical energy in Boise, and, under that franchise, such a system was constructed. Prior to the commencement of these proceedings, therefore, the Idaho Power Company had and owned two franchises and two distribution systems in

Boise. As a result of the ownership and operation of both systems by one concern, it was found that there was considerable duplicate equipment in the city. This duplicate equipment was of the value of at least $105,000 in 1920, and the expense of operating and maintaining it was in excess of $25,000 per annum.

The power company, being desirous of removing the duplicate and unnecessary equipment and of dispensing with the necessity of maintaining the same, commenced negotiations with Boise City looking to the cancelation of the franchise of the Beaver River Company. Early in 1920, the parties finally came to an agreement which provided that the Beaver River franchise, held by the Idaho Power Company, be repealed and canceled. At the same time, a street lighting contract was also entered into, and respondents contend that, while in form there were two separate contracts, they were the result of one common and general understanding. It is not apparent, however, that the street lighting contract has any bearing on the question at issue.

This controversy grew out of the Beaver River franchise cancelation contract. The power company filed an application with the Public Utilities Commission asking to be permitted to enter into the contracts. The commission made order No. 672, approving the two contracts. When the city council learned that the commission had made an order relating to the Beaver River franchise contract, being dissatisfied with the order, it asked for a rehearing, which was granted. Evidence was submitted by the parties, and the commission then made its order No. 750, which modified and approved order No. 672. This appeal is from order No. 672 as modified by order No. 750.

For the consideration expressed therein, the city of Boise, in the cancelation contract, agreed:

"To relieve said Company of all of its obligations under said franchise, and to permit it to abandon the same and to dismantle and remove, such as it may desire of, its said substations and distribution systems now maintained as duplicate investments.

"To take formal action and pass a valid ordinance canceling and repealing Ordinances (identifying ordinances to be repealed) . . . . "

The cancelation contract also furnishes the following information:

"Whereas, under and by reason of said franchise, the Company is now maintaining duplicate investments in substations and distribution systems within the corporate limits of the said City in value exceeding One Hundred Five Thousand Dollars ($105,000), the operating and investment charges of which are in excess of Twenty-five Thousand Dollars ($25,000) annually as estimated by said Company . . . . "

In its order No. 672, the commission described the contract as follows:

"A contract by which the said City of Boise agrees to cancel and annul a certain franchise expiring in 1932, heretofore granted to the Beaver River Power Company, predecessor in interest of said Idaho Power Company, applicant herein, and to permit applicant to remove certain of its lines and equipment required to be maintained and operated by the terms of said franchise, marked Exhibit 'B' of the application. This contract also provides for the payment to said city by applicant of certain sums annually, in lieu of an annual franchise tax imposed by the terms of said franchise. It is shown that to comply with the provisions of said franchise requires applicant to maintain and operate duplicate equipment in the City of Boise of approximate value of $105,000, at an annual cost of about $25,000."

The order of the commission then goes on to say:

"The commission feels that this duplication should be eliminated, not only in the interest of the City of Boise, but also because the saving of $25,000 in operating expenses will be reflected over applicant's entire system, and therefore finds that said second contract should be approved. However, the Commission will not permit the payments as set forth in said contract, in lieu of the franchise tax payments, to be charged into the general operating expenses of the

Idaho Power Company, applicant herein, as such payments inure to the City of Boise alone, but so long as such payments are made, will require applicant to pro rate same among its patrons within the City of Boise, and collect same from them.''

After ordering that the franchise cancelation agreement ''be and the same hereby is approved,'' the commission made that portion of its order No. 672 about which the city complains, viz.:

''It is further ordered, that until all payments under this contract have been met and complied with, the Idaho Power Company shall add to the charge for service rendered in January of each year to each patron within the corporate limits of the City of Boise, in proportion to the amount of service rendered such patron, an amount sufficient to aggregate in total the amount to be paid to the City of Boise under such contract during such year, under such a statement as to clearly indicate to the patron the cause of such charge.''

As a result of a rehearing on the question, the commission, by its order No. 750, modified the foregoing order No. 672 as follows:

''It is therefore ordered, that the Idaho Power Company be, and it is hereby required to prepare and to file with the Commission as of the day when this order shall become effective, such rates, fares and charges for its service as shall serve to offset any preference or advantage which may at such time exist in favor of the city of Boise and against other localities by reason of the franchise granted to the Beaver River Power Company on February 20, 1912, or by reason of the proposed contract for the cancellation of said franchise, and that Order No. 672 be and the same is modified in accordance herewith.''

Under the assignments of error, the power of the commission to make these orders is questioned. The attorney general appeared on behalf of the commission, as was his duty and right, and argued that, in view of order No. 750, directing the power company to file with the commission such rates

and charges for its services as would serve to offset any preference or advantage which might exist in favor of the city of Boise and against other localities, either by reason of the Beaver River franchise or by reason of the proposed contract for its cancelation, the city of Boise was premature in making its objection to the order of the commission, and that the city should await the filing of such rates to determine whether or not it has any reasonable complaint against rates to be filed in compliance with order No. 750. The city contended that the commission erred in holding that the payment to the municipality of the consideration of the cancelation agreement should be collected by the power company from its customers in the city of Boise. The power company defended the action of the commission in making the orders, and contended that, while the provisions of the franchise were originally legal and binding upon the parties thereto, under the public utilities law they constituted a preference and a discrimination in favor of Boise as to other municipalities and users throughout the state, and, therefore, they became unenforceable upon the passage of the utilities law. The preference and advantage the power company claims existed under the franchise consisted in the payment to Boise City of a gross percentage of the receipts of the company from its users in the city, and the obligation of the power company to maintain the system throughout the duration of the franchise in order that Boise City might exercise a right reserved to the city to purchase the Beaver River equipment at the end of the period of the franchise. It is also vigorously urged that the cancelation contract merely preserves in a different form such advantages and preferences as the city enjoyed under the franchise.

It will not be seriously disputed, we believe, that the law of this state prohibits the creation or the existence of any preference, advantage or discrimination, either in favor of or against any person or corporation, as to rates, facilities, service or charges; and any unreasonable difference as to rates, facilities, service or charges is prohibited, as to localities or classes of service. The law has also conferred very

broad rate and regulatory power upon the commission charged with the duty of supervising and regulating the public utilities of the state. (*Idaho Power & Light Co. v. Blomquist,* 26 Ida. 222, Ann. Cas. 1916E, 282, 141 Pac. 1083; *Sandpoint Water & Light Co. v. City of Sandpoint,* 31 Ida. 498, 173 Pac. 972, L. R. A. 1918F, 1106.)

To sustain its contentions, the power company places great reliance upon the decision of this court in the case of *Sandpoint Water & Light Co. v. City of Sandpoint, supra.* In that case, the city of Sandpoint had granted a franchise to the water company to construct a water system. A schedule of rates was fixed in the franchise, and the city was to be furnished with water, without cost, for street sprinkling and fire purposes. The commission made an order directing that the city pay the water company, at a rate fixed in the order, for water for street sprinkling and fire purposes. The commission also directed that the city transfer the fire hydrants to the company and receive a certain sum therefor, to be paid in water, the city having paid for the fire hydrants when the system was originally constructed. In this court, the city questioned the power of the commission to make the order, and contended that the order was invalid in that it resulted in the impairment of the obligation of the contract between the city and the water company, and this court said:

"In granting a franchise by which rates are fixed or determined, a municipal corporation is not exercising its own powers, but is exercising only such powers as have been conferred upon it by the state. These powers may be withdrawn at any time. A municipality has no vested right to the continued exercise of such powers, nor can it obtain a vested right in any contract entered into or property acquired through the exercise of such powers as against the right of the state, its creator, to assume complete control of its affairs. (19 R. C. L. 730, 731; 28 Cyc. 282 et seq.; *Collingswood Sewerage Co. v. Borough of Collingswood,* 91 N. J. L. 20, 102 Atl. 901.)"

With respect to that portion of the order directing the city to transfer to the company the hydrants belonging to the city, this court said:

"We express no opinion as to the validity of the order of the commission directing the transfer of the hydrants by the city to the appellant, as this question is not within the issues raised by the pleadings."

In the Sandpoint case, the court was discussing "a franchise by which rates are fixed or determined," and this court held that the city of Sandpoint had no right to continue to exercise the power to fix and determine rates, although it had lawfully exercised that power prior to the passage of the public utilities law. The court also said that a municipality could not obtain a vested right in any contract entered into or property acquired through the exercise of power to fix and determine rates as against the right of the state to fix and determine rates. But that decision was limited to contracts or franchises which fixed and determined rates. The court expressly refused to pass upon the validity of that portion of the order directing the city to transfer its water hydrants to the water company, and this fact indicates that the court did not want to be understood as holding that the commission had the power to make that portion of its order.

Conceding, however, for the purpose of the argument, that the Beaver River franchise was such in its nature and terms as to come within the power and jurisdiction of the commission, under the authority of the Sandpoint case, to fix and determine rates, and that the commission, upon a proper hearing, would have been justified in preventing the collection by the power company from its users, and the payment to the municipality, of the agreed percentage of the power company's gross revenue from the city, such, however, was not the case before the commission, and that is not the case now before this court. We have here, as the commission had before it, a contract, the terms of which are entirely different from the provisions of the franchise. It is a new contract. It was solemnly executed by the authorized rep-

resentatives of the power company and the municipality. It was the subject of two hearings, and its purposes have upon two occasions received the approval of the commission. (Orders No. 672 and No. 750.) The rights of the parties on this appeal, therefore, are to be determined by the provisions of the new or cancelation contract, and the law applicable thereto. The franchise and its provisions are of importance only in determining what valuable property rights the city surrendered, if any, and what obligations the company was relieved from performing. As before stated, it appears that the city originally had the right to a percentage of the gross revenue of the company collected from its patrons in Boise, and had the further right to purchase the Beaver River equipment upon the termination of the term of the franchise; and the power company. was obligated to pay the agreed percentage of the gross revenue and to maintain the Beaver River equipment so that the city could exercise its right to purchase the same upon the termination of the franchise.

It is well settled in this state, under the authority of the Sandpoint decision, that any of the provisions of the franchise, even though valid and enforceable at the time of the granting of the franchise, in conflict with the power of the state as expressed in the utilities law, became valueless and unenforceable upon the enactment of such law. However, the inclusion within the terms of a franchise of an invalid provision did not necessarily render invalid all other provisions of the franchise. Provisions of the franchise not in conflict with the utilities law were not affected by the enactment of the utilities law. The important question, therefore, is to determine whether or not any right reserved to the city in the franchise which the city has contracted to surrender remained valuable and enforceable upon the passage of the utilities law. Under the facts in this case, we cannot see how the naked right reserved to the city to purchase the Beaver River equipment upon the termination of the period of the franchise, upon the passage of the utilities law, constituted any preference or advantage in favor

of Boise City and against other localities or users. We have discovered nothing illegal about Boise's reserving the right to purchase the Beaver River system upon the termination of the franchise at the time this franchise was granted, and we have not been furnished with any sufficient reason or authority for concluding that the reservation of such right was rendered unlawful by the passage of the utilities law. This right conferred no preference or advantage on Boise City or any user in Boise City as to rates, charges, service or facilities; there was not thereby established or maintained any unreasonable difference as to rates, charges, service, facilities or otherwise, either as between localities or classes of service; it did not affect the reasonableness of any rate or charge; and the power company was not rendered less able to furnish, provide and maintain such service, instrumentalities, equipment and facilities as might be calculated to promote the safety, health, comfort and convenience of its patrons, employees and the public.

In the case of *Chicago v. O'Connell*, 278 Ill. 591, 116 N. E. 210, 8 A. L. R. 916, the Illinois supreme court had before it a question somewhat similar to that here under discussion, and said:

"Appellees contend, however, that the settlement ordinances and the unification ordinance, having been accepted and acted upon by the railway companies, constitute binding contracts between the city and the railway companies, and that their obligation cannot be impaired by any act of the legislature or by any order of the State Public Utilities Commission. Appellees' contention is undoubtedly sound so far as the contracts relate to matters which do not affect the public safety, welfare, comfort or convenience. Thus, the grant of the right to the railway companies to construct and operate street railways in the city, the agreement to divide the net receipts between the railway companies and the city and the option given to the city to purchase the railway properties at a certain price are all matters which do not affect the public safety, welfare, comfort or convenience, because it is immaterial to the public what person

or corporation operates the street railways or what disposition is made of the profits, and over those matters neither the State nor the State Public Utilities Commission has any control by virtue of the police power. . . . . ''

As a matter of fact, the lighting contract hereinbefore referred to, which was entered into by the city and the power company at the same time as the cancelation contract, contained a provision giving the city of Boise the right to purchase the equipment to be erected under that contract at a valuation to be fixed by the utilities commission. If the right vested in Boise City to purchase the Beaver River equipment became void and unenforceable upon the passage of the utilities law, why does the power company continue to make such unlawful and unenforceable agreements, and why was such an agreement approved by the utilities commission, in the lighting contract, in orders 672 and 750? The naked right to purchase the Beaver River equipment upon the termination of the franchise was a valid, valuable property right, and it did not constitute an advantage or preference so as to render it invalid upon the passage of the utilities law of this state.

Even though the right to purchase the Beaver River system at the end of the period of the franchise did not constitute such an advantage or discrimination as is prohibited by the utilities law, did the fact that it later became necessary, under the franchise, to expend approximately $25,000 per year to maintain equipment in Boise, which became duplicate and unnecessary because of the consolidation of the two systems, constitute such an advantage or discrimination, under the utilities law, as to make void the provision of the franchise giving Boise City the right to purchase the Beaver River equipment? The fact that the power company had duplicate and unnecessary equipment in Boise was not due to the Beaver River franchise. Boise City was not responsible for it. It was the result of the consolidation of the two systems, for which the power company alone was responsible. The power company, after its purchase of the Beaver River system and its consolidation with the other

system, found that it had duplicate equipment representing an investment of about $105,000, and the fact that the power company desired to remove the duplicate equipment shows that it was not necessary to serve its customers in Boise. There is nothing extraordinary about there being duplicate and excess equipment as a result of the consolidation of two systems originally constructed for the same purpose. Had the Beaver River system continued to operate as was naturally contemplated at the time the franchise was granted, this right reserved therein to the city of Boise would never, in all probability, have been brought into question; there would not have been duplicate and unnecessary equipment in the sense that we are now considering the term, and there would never have been charged or collected anything to maintain such duplicate and unnecessary equipment. The Beaver River Company would have continued to operate and furnish its products to its users, and the $105,000 of equipment that became duplicate and unnecessary would have been utilized, and deemed useful and necessary, in serving the users of electricity in Boise. This court is not unmindful of the fact that certain advantages would naturally be expected to result from such a consolidation, but they would not alter the legal rights of the parties in so far as this particular question is concerned. The contention that this duplicate equipment was a stand-by service for the special benefit of Boise is not sustained by the record. The duplicate equipment was maintained primarily for the reason that the power company was under a contractual obligation to keep the Beaver River equipment in such condition that the city of Boise could exercise its right to purchase the same if it so desired.

Concluding, as we have, therefore, that Boise City was in nowise responsible for the duplicate equipment, that it was neither provided for in the franchise nor contemplated by the parties at the time of the granting of the franchise, but that it resulted from the consolidation of the two systems, on account of which the power company alone is chargeable, it follows that, under the public utilities law,

neither the users of electricity in Boise nor Boise as a locality enjoy any such unreasonable preference or advantage because of the obligation of the power company to maintain such duplicate investment and duplicate and unnecessary equipment as to make void and valueless the right of the city to purchase the Beaver River equipment.

The commission seemed to be impressed with the importance of the idea that the consideration of the cancelation agreement merely constituted the payment to the city, under a different name, of the percentage of the gross revenue provided in the original franchise. The fact that the sum finally agreed upon as the consideration of the cancelation agreement appears to be approximately the same in amount as the estimated balance that was to have been paid to the city under the franchise is not important as we view the case. The principle involved would be the same if the consideration to be paid the city had been $100,000 or $500 or any other sum. As to the manner in which the amount of the consideration came to be agreed upon, Mayor Eagleson testified:

"Q. In arriving at this amount you estimated what amount the franchise would be if continued as at present?

"A. Yes, sir.

"Q. And agreed on that amount?

"A. That was the lowest figure we talked of. We had other things in mind and talked over but we generally came down to the franchise. Mr. Putnam came up to the franchise tax from the $14,000 offer to $35,600, and we came down from ours to that thing as a basis."

The estimated amount the city expected to receive under the provisions of the franchise naturally furnished a basis for negotiation between the parties. However, they finally agreed that the power company would pay the city $35,594.73 in consideration of the surrender by the city of its rights under the franchise.

When the power company purchased the system and franchise of the Beaver River Company, it not only purchased certain equipment which, because of the consolidation of the

two systems, became duplicate and to an extent unnecessary, but it took the property burdened with the condition that the city of Boise could exercise its reserved right to buy it at the end of the term of the franchise. In making the cancelation contract, wherein Boise agreed to surrender the rights of the city under the franchise, including the city's right to purchase the property, the power company, it would seem, was merely completing the original purchase of the Beaver River system; it was freeing the property from the burdens imposed upon it prior to the time of its purchase by the power company. Boise City's right to purchase the Beaver River system at the end of the franchise term was a valuable property right. The right belonged to Boise City. The power company desired to and did enter into a contract by which the city surrendered this right. It would seem that there would be no more reason or justice in making any users of electricity pay the consideration of the cancelation contract than there would have been in making them pay the original purchase price of the Beaver River system. The commission said in its order No. 750:

"Our province and duty go no further than to see that the cost of these benefits does not fall on those who receive no benefit from them. . . . . "

With this conclusion of the commission, this court is in full accord. But how does it especially benefit a user of electricity in Boise that the power company has a full and complete title to the Beaver River property, rather than a title burdened as hereinbefore pointed out, or that the power company be enabled to remove duplicate equipment from Boise and sell or use the same in some other section of the state?

The orders of the commission, in effect, informed the city that the purposes of the cancelation agreement met with the approval of the commission, but that, it being inequitable and unfair for the power company to collect revenue from its users throughout its entire territory with which to pay the city of Boise the consideration for the cancelation agree-

ment, therefore the power company should add sufficient to its present rates charged users in the city to pay the city. The commission was entirely right in holding that users outside of Boise should not furnish any part of the payments to be made to Boise. But the commission, as well as the respondents, has failed to furnish any sufficient reason why the users of Boise should furnish funds out of which the power company can pay Boise City the agreed consideration of this cancelation contract; and this court cannot give its assent to the commission's determination of the question.

In the cancelation contract, the city of Boise surrendered at least one valuable property right, viz., the right to purchase the Beaver River equipment; and the surrender of this right was sufficient to support the consideration therein agreed to be paid to the city by the power company. The cancelation contract was entered into willingly by the power company; in fact, the record shows that the power company was the moving spirit in securing the execution of the contract, which it has tried so ably to have rendered ineffective. The contract is in writing. There can be no doubt as to its terms and meaning. No valid reason has been furnished this court which would justify relieving the Idaho Power Company of the obligation which it willingly assumed. It necessarily follows, therefore, that the orders of the commission directing that consideration of the cancelation contract be collected in any manner, either directly or indirectly, from any customers of the Idaho Power Company in the city of Boise, are beyond the power of the commission, and are void. Such orders, to the extent above set forth, are reversed and set aside.

Appellant will recover its costs.

Budge, C. J., and Dunn and William A. Lee, JJ., concur.

McCARTHY, J., Concurring Specially.—The opinion assumes the validity of the contract canceling the Beaver River Company franchise because appellant had the right to sell and respondent power company had the right to buy, a re-

lease of the option to purchase the duplicate equipment, reserved to appellant by the franchise. If the contract be valid I agree that said respondent has no right to charge the purchase price to the consumers in Boise or elsewhere. If the equipment has been put to proper use a just valuation of it may be included in the rate base. In no event can the purchase price be charged directly to the consumers.

The validity of the contract is not expressly before us for decision, no appeal having been taken from the order of the Public Utilities Commission which approves it, and the question not being within the issues. In the briefs certain questions are raised *arguendo* touching the validity of the contract. These questions should be passed upon when, if ever, they are directly raised in an appropriate proceeding. They should not be passed on, even inferentially, unless it is necessary to do so. I do not think it is for this reason. If the contract be invalid, the result is the same. If respondent company be not bound to pay the consideration to appellant by reason of invalidity of the contract, it certainly cannot do so and then charge it back to the consumers.

In any event the commission erred in making the orders appealed from. I concur in the conclusion reached.